# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHARLES GARY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 13 C 8048 |
| ) | |
| CITY OF NORTH CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Charles Gary has sued the City of North Chicago, its mayor Leon Rockingham, Jr., its former Chief of Police Michael Newsome, and North Chicago police officer William Bogdala. In count two of his amended complaint, Gary asserts claims against Bogdala and the City under 42 U.S.C. § 1983 based on Bogdala's alleged use of excessive force when effectuating Gary's arrest. Bogdala and the City have moved for summary judgment on this claim. For the reasons stated below, the Court denies their motion.

## Background

The following facts are not disputed except where otherwise noted. Late one night in November 2011, Waukegan police officer Adriana Cancino was on patrol when she observed a man walking southbound on North Green Bay Road toward a Citgo gas station in Waukegan. She also observed another two men running southbound on Green Bay beyond the Citgo station, between a car dealership parking lot and a

residential building. Cancino drove behind the residential building, where she observed two men in a gold sedan. She also observed a third man standing beside the sedan. That man was later identified as Charles Gary.

Cancino radioed for backup, turned on her emergency lights, and approached the sedan to speak with the men. As she approached, Gary departed. During her deposition, Cancino recalled that at the moment she parked and disembarked from her police car, Gary "immediately started running." Def.'s Ex. 1, dkt. no. 93-1, at 81:15. Cancino also looked at her report from the incident and testified that she first asked Gary what he was doing; after responding that he had just bought some cigarettes, Gary "proceed[ed] east through the building. . . . I did not write run, but he then proceed[ed] to run." *Id.* 82:6–10. Gary, on the other hand, recalls that as soon as he saw Cancino's police lights, he walked away from the scene. Def.'s Ex. 2, dkt. no. 93-2, at 14. He denies interacting with Cancino when she pulled up. Both parties agree that Gary departed because he was on probation at the time and was prohibited from having any contact with police. Upon arriving at the front of the residential building, Gary made his way to the right side of a metal railing lining the walkway to the building's entrance. Once there, he laid down on his stomach under some bushes.

At some point before, during, or after her first encounter with the men in the sedan (she could not remember the chronology during her deposition), Cancino became aware that a group of men, at least one of them armed, had robbed the Citgo down the street. Suspecting that the men in and around the gold sedan might have perpetrated the robbery, Cancino detained the men in the sedan and another man who had joined the group after Gary left the scene. Cancino or some other officer then called to request

2

the assistance of a canine unit in order to track and locate Gary.

North Chicago police officer Bogdala responded to the call for assistance with his police dog, Drago. Bogdala, a trained canine specialist, knew that he had been summoned to track a suspect involved in an armed robbery. He learned upon his arrival that Waukegan police had three suspects in custody and one suspect had fled on foot. Before beginning to track Gary, Bogdala loudly announced that he was releasing a police dog, declaring, "North Chicago Police K-9, come out with your hands up." Def.'s Stat. of Material Facts, dkt. no. 93, ¶ 24.

Cancino accompanied Bogdala as he began Drago's track, throughout which Bogdala kept Drago on a six-foot leather leash. After tracking for about fifteen to twenty feet, Drago located a firearm in the bushes. Drago continued tracking toward the entryway of the residential building. When the dog arrived at the building's front entrance, he tracked up and down the front walkway four to five times. From his position lying prone in the bushes, Gary could see Cancino and Bogdala walking along the walkway and could hear their radios and voices, in addition to the sound of Drago pacing the walkway.

According to Gary, Drago stopped pacing and began scratching and pawing at the pavement on the other side of the railing that separated Gary and the bushes from the walkway. Gary recalls one of the officers shining a flashlight on him and being told to put his hands on his head. By contrast, the officers both testified that they neither heard nor saw anything to indicate anyone was hiding in the bushes. Although Gary did not verbally respond to the officers' instructions, he placed his hands behind his head and continued to lie prone on his stomach in the bushes.

At this point, Drago jumped over the railing and into the bushes, where he bit Gary's hand, wrist, and the back of his head. Bogdala and Cancino heard Gary exclaim, "my hand," and Bogdala jumped over the railing into the bushes. Cancino waited a moment and then ran around the end of the railing and into the bushes as well. Drago had hold of Gary's hand or wrist and attempted to pull Gary from the bushes into an adjacent rocky area. Bogdala shined his flashlight on Gary, ordered him to "show me your hands" and stop fighting the dog, and assisted Drago in dragging Gary from the bushes.

Bogdala and Cancino both testified that they were unsure whether Gary was armed at the time, and Bogdala testified that he believed Gary might be dangerous because Drago had already located a weapon close by. Bogdala did not order Drago to release Gary until Bogdala had climbed over the fence and Cancino was in a position to cover him. When Bogdala ordered Drago to release, however, Drago did not respond. Drago continued to clamp his teeth down on Gary's hand, Gary continued to scream, and Bogdala continued to order Drago to desist. Bogdala gave at least three orders to disengage, spanning between eight seconds and one minute, before Drago finally let go of Gary's hand and wrist.

Gary sued the defendants in November 2013 alleging, among other things, that Drago's attack constituted excessive force in violation of the Fourth and Fourteenth Amendments. Bogdala and the City have moved for summary judgment on Gary's excessive force claim.

## Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue

4

of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Claims that a police officer used excessive force in the course of an arrest are subject to the Fourth Amendment's reasonableness standard. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This standard is applied to determine "whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an 'objectively reasonable' manner." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). To assess reasonableness, the court (or, at trial, the finder of fact) "must consider all of the circumstances, including notably '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Johnson*, 576 F.3d at 660 (quoting *Graham*, 490 U.S. at 396).

Defendants argue that all three of these factors weigh in their favor and that no reasonable jury could find that Bogdala's use of Drago to subdue Gary was unreasonable. First, defendants point out that Gary was suspected to have participated in a serious and violent crime. Second, given the nature of that crime, they contend that it was reasonable for Bogdala to believe that Gary might be armed. Third, although

Gary was lying still when found and, upon being found, placed his hands behind his head and did not move from his position, defendants argue that because he had previously left the sedan when Cancino approached and was hiding in the bushes, Gary was "attempting to evade arrest by flight." Defendants acknowledge that Gary had arguably surrendered, but they contend that due to his choice to flee, Bogdala acted reasonably in not accepting that Gary had completely and genuinely surrendered.

Defendants liken this case to *Johnson*. There, a suspect in a shooting fled from police by car. The suspect violated numerous traffic laws in an effort to evade capture, and upon encountering a road block, he continued his flight on foot. When the suspect found himself cornered, he threw up his hands in surrender. An officer and his police dog were in pursuit only a few feet away when the suspect suddenly offered his surrender. In the split second (actually no more than one second) that followed, the dog lunged at the suspect, grabbing his arm and knocking him to the ground. *Johnson*, 576 F.3d at 659. It is well established that an officer may not continue to use force against a suspect who is subdued and complying with police orders. *See Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001). The Seventh Circuit acknowledged this in *Johnson* but held that "[n]o law that we know of required [the officer] to take Johnson's apparent surrender at face value," because Jackson might have been able to retrieve and use a weapon, and in particular because no more than one second had passed between Johnson's surrender and the use of force. *Johnson*, 576 F.3d at 660. Defendants also note that a number of district courts have likewise found reasonable the use of a police dog to subdue a surrendering suspect. *See, e.g.*, *Alicea v. Thomas*, No. 2:11 C 445, 2014 WL 4311079 (N.D. Ind. Sep. 2, 2014); *Martin v. Luckett*, No. 07 C 2800, 2011 WL 1231024

(N.D. Ill. Mar. 30, 2011); *Brady v. Scott*, No. 1:09 C 110, 2010 WL 3946527 (N.D. Ind. Oct. 5, 2010).

This case is markedly different from *Johnson*. There, the suspect "had used every method at his disposal to flee from police," only surrendering "a split second" after he stopped running from them. *Johnson*, 576 F.3d at 660. It was unclear whether Johnson was armed, and the apparent peril of the situation was magnified by his erratic and reckless behavior while fleeing first by automobile and then on foot. *Id.* Moreover, the undisputed facts showed that there was almost no amount of time separating Johnson's surrender and the officer's use of force. *Id.* Ultimately, "[t]he critical fact in *Johnson* was that the officer 'had no idea how Johnson was going to behave once he was cornered.'" *Miller v. Gonzalez*, 761 F.3d 822, 830 (7th Cir. 2014) (quoting *Johnson*, 576 F.3d at 660).

This case is also very different from the district court cases upon which defendants rely, all of which involved plaintiffs who shortly before their capture had led police on an active chase. In *Alicea*, police used a dog to subdue a suspect after chasing him through a neighborhood following a burglary. *Alicea*, 2014 WL 4311079, at *1–2. The plaintiff offered his surrender while standing inside an empty swimming pool. *id.* at 2. In light of the quickly evolving situation and the fact that police would be especially vulnerable to attack while climbing into the swimming pool to effectuate the arrest, the court found reasonable the officers' use of a dog to subdue the plaintiff. *Id.* at 4. In *Martin*, the suspect led police on an hour-long car chase through multiple jurisdictions while under the influence of alcohol and crack cocaine, breaking numerous traffic laws and actively demonstrating his indifference to human life and property in the

process. *Martin*, 2011 WL 1231024, at *2. The suspect in *Brady* likewise led police on a car chase before jumping out of his car to offer his surrender. *Brady*, 2010 WL 3946527, at *2.

By contrast, Gary's account—which the Court must accept as true for purposes of the present motion—is that he walked calmly away from Cancino's police cruiser and laid down in the bushes on the other side of the building. In addition, there is no evidence of any sort of active pursuit, nor is there evidence of any disregard on Gary's part, reckless or otherwise, for the safety or well-being of the officers or others. According to Gary, Bogdala found him lying in the bushes, plainly visible and complying with instructions to place his hands on his head. By Gary's account, Bogdala knew or should have known that Gary was subdued before he allowed Drago to jump the rail and bite him.

It is true that Gary left the scene when Cancino arrived, but the circumstances as he describes them did not create the type of danger or reasonable fear of harm that would justify the use of force given that he was lying on the ground, not moving, with his hands behind his head at the time of the use of force. As the Seventh Circuit stated in *Miller*, "[the] prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Miller*, 761 F.3d at 829. Viewing the record in the light most favorable to Gary—as the Court must at this juncture, *id.* at 826—the circumstances were such that a reasonable jury could find Bogdala used unreasonable force against Gary.

Lastly, defendants urge the Court that even if Bogdala's use of force was not

8

objectively reasonable, summary judgment is proper on qualified immunity grounds. When a plaintiff shows that excessive force was used against him, to overcome an asserted defense of qualified immunity the plaintiff must further establish "that it was objectively unreasonable for the officer to believe that the force was lawful—i.e., [he] must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott v. Sangamon Cty.*, 705 F.3d 706, 725 (7th Cir. 2013).

Determination of whether a defendant is entitled to qualified immunity involves a two-part inquiry: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). The Seventh Circuit has further explained: "The relevant inquiry in determining whether a right is clearly established is whether it would have been clear to a reasonable officer that his conduct was unlawful in the situation the officer confronted." *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011).

A constitutional right is "clearly established" for the purpose of qualified immunity where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To determine whether a right was clearly established at the time of an incident, courts look to controlling precedent from the Supreme Court and this circuit. If there is no such precedent, courts examine "all relevant case law to determine 'whether

there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012) (quoting *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010)). "Importantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense." *Abbott*, 705 F.3d at 731. Still, "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Phillips*, 678 F.3d at 528 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Construed in the light most favorable to Gary, the facts make out a clearly established constitutional violation. It was clearly established well before Bogdala's encounter with Gary that "force that is reasonable while a suspect poses a threat may no longer be reasonable as the threat decreases." *Miller*, 761 F.3d at 829 (citing *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010)); *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (same). And at the time of Gary's arrest, it was clearly established that where a suspect is prone and subdued, it is objectively unreasonable to use significant force to effectuate his arrest. *See Miller*, 761 F.3d at 828–29 (collecting cases). In addition, in light of the evidence offered by Gary, which the Court must view in the light most favorable to him at this stage of the case, it would have been objectively unreasonable for Bogdala to believe that it was lawful to allow Drago to attack Gary while he was subdued and lying on the ground with his hands behind his head. For these reasons, Bogdala is not entitled to qualified immunity.

**Conclusion**

For the foregoing reasons, the Court denies defendants' motion for summary judgment [dkt. no. 91]. The case is set for a status hearing on February 10, 2016 at 9:00 a.m. for the purpose of setting a schedule for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 1, 2016